We will now hear argument in the final argued matter of the day, Gill v. Department of Justice. Good morning. Good morning, Your Honors. May it please the Court, Linda Lai for Plaintiffs. I'd like to reserve 5 minutes for a rebuttal. Keep your eye on the clock. We'll try to help you. Thank you. Plaintiffs, Your Honors, are five innocent Americans who have been wrongly branded as potential terrorists because the functional standard sets a very low threshold for designating suspicious activity reports. The functional standard should be invalidated and vacated for two reasons. It was adopted without notice and comment, and it is also arbitrary and capricious. Can I ask you to focus on the second one for a second? Notice and comment only matters if this is a legislative rule. Correct. I know you insist that it is, but just for the moment, assume that it's not a legislative rule, so we're not dealing with notice and comment. The arbitrary and capricious argument you make is that they didn't sufficiently consider the other regulation. Yes. Didn't they do that with respect to the 2015 reissuance of the regulation? So the only argument we have, the only justification the government forwards in the record for why 28 CFR and its higher reasonable suspicion threshold do not apply to suspicious activity reports is appears in the record in 2015. Right. So why isn't that sufficient? Because the government, one, I'm happy to discuss why it's meritless, and two, the government doesn't even attempt to defend it here. The government, in the record, argues that suspicious activity reports are not criminal intelligence governed by the regulation, because, quote, criminal intelligence information is a product of investigation that appears at ER 500. That is a false dichotomy, Your Honor. It is true that criminal intelligence information is not a product of investigation that appears at ER 500. Well, the question is whether it's arbitrary and capricious. And so as I read what they say in 2015, I mean, I think it's a great reason, they say, well, this is different in criminal investigation. We don't have to follow the other reg, because here, we're not focusing on carrying through with a prosecution of a crime, but rather trying to determine in advance whether or not there's some reason to think there might be terrorist activities. It may be a terrible policy, but it strikes me at least as a real distinction, isn't it? No, it's not a real distinction, Your Honor. The articulated rationale in the record, not one sort of amplified and buttressed by the sort of reasoning that I think you're articulating here on the bench, the articulated rationale in the record at ER 500 is that criminal intelligence information is a product of investigation. That is true, but so are suspicious activity reports, the whole point. Are they? Yes, absolutely. So I'm the local police department, and someone calls me and says, there's a bunch of suspicious terrorists meeting somewhere. And I make a report, and I forward it to the ICE. I've done no investigation, have I? By its terms, the functional standard calls for a multi-stage evaluation and vetting and investigation process. If I may draw your attention, for example, to ER 553. One of the first stages in the functional standard's multi-stage evaluation and investigation stage. This consists of, quote, observation, interviews, and other investigative activities, end quote, to, quote, gather additional facts. For example, Mr. Wiley Gill was the subject of a suspicious activity report. He enjoys playing video games. The Chico Police Department engaged in all kinds of investigation, questioning him on many instances, noting his, quote, pious demeanor, end quote, as something that was worthy of note. So, yes, the functional standard, by its terms, calls for investigation at multiple levels of review. Sotomayor, if this is an interpretive rule, not a legislative rule, what case do you cite for the proposition that you need an articulated rationale for it? I would say both California v. Norton and Western Watersheds v. Kreienbrink. Those cases, decisions of this Court make clear that, whereas here, the record indicates that a legal obligation, quote, may apply, not necessarily that it does apply, that it may apply, then it is incumbent on the agency to articulate a rationale as to why it does not apply. It may not sort of conclusively assert that it does not apply. Now I need your help in understanding something here. The fusion centers. Yes. Who and the analysts who work for the fusion centers, who are they employed by? Fusion centers are inter or they're about 70. This is not in the record, but they're about 70. I think other portions of the record identify that they are inter-jurisdictional agencies, State and local. Sometimes there is an FBI joint terrorism task force that participates. It depends on the particular review. Well, because your argument, I think, depends on the notion that the functional standards impose some sort of legal obligation on someone. And I'm trying to figure out, they are directed to the analysts. What they say is, analysts, these are the ones that you, these are the things you ought to put in the system, in effect, circulate. Yes. So I'm trying to figure out who the analysts upon whom these legal obligations are imposed work for. So this is a situation in which the promulgating agency, the program manager for the information sharing environment, has effectively delegated implementation to the participants in the nationwide suspicious activity reporting initiative. I understand that. I'm asking a very specific question. Yes. Who do the analysts work for? It varies. So if it's a local police department, it will be the local police department. With respect to a fusion center, sometimes they work for the FBI. Sometimes they work for a local sheriff's department. It depends on the configuration of the particular fusion center, and they vary from they are creatures of particular MOUs, and it depends on how they are structured, Your Honor. What is going to happen to these analysts if they don't follow the functional standards? So the each are As opposed to their agencies. Right. So with respect to the, I don't know if there will be disciplinary consequences. But with respect to the eGuardian user agreement, that makes clear. Well, but you see, but the difficulty is this imposes obligations on the analysts. The eGuardian users just put information into the system and get it back. But agency. What you're complaining about in this case is not the input of information. You're complaining about the circulation of information because it meets the functional standards. We're complaining about both, Your Honor. Agencies can only. Well, the functional standards don't deal with the inputting of information. Yes, they do. They only deal with the classification of information we're seeing. Maybe I could ask a question in this area, because I wonder about it, too. Why isn't this the PICUS case? I agree, Your Honor. This is exactly the PICUS case. This is a situation in which the functional standard has designated 16 specific categories of behavior that the defendants have deemed to have a potential nexus to terrorism, exactly like the parole selection criteria in PICUS. It guides the decision makers. And so here, analysts have no discretion to submit a suspicious activity report that falls outside. I agree with you. So the effect is actually on citizens. It's not so much on the employees of some governmental agency. It affects both. It binds the decision of the analysts at the fusion center. But in Mada Luna, this court's decision on a legislative rule, it described a legislative rule as something that binds the agency or it's implementing official. And so here, it's the analysts at the fusion center who are implementing the task. And Leon speak. Counsel, let me jump in here. Yes. It's important for me to understand how this started. My understanding of this is that after 9-11, the president said, people can't talk to each other. We had all these levels of government actors, first responders. They have no idea how to communicate with each other. And since the Constitution is not a suicide pact, everybody kind of agreed. And the ACLU was very much involved, as I understand it, in a number of iterations of these standards. Am I wrong about that? With respect to the ACLU, Your Honor, I think the record is clear that when the ACL, the first version of the functional standard proposed a maybe indicative standard. The ACLU proposed reasonably indicative. However, the record makes clear from the context of the emails in which that occurred that the ACLU intended reasonably indicative to be synonymous with and not lower than reasonable suspicion. My point is not what ultimately occurred, but rather that they were part of the process. And ultimately, there's disagreement. I get that. But the bottom line was the civil rights community, law enforcement, Congress, and others got involved to try to come up with a system. What ultimately came down, of course, is what we're talking about here. And what I need to understand here is, number one, is this a final action? And how do we get to that? I don't see where people don't do what this calls for, that there's any consequence to them at all. They can do it, or they cannot do it. It seems advisory to me. What am I missing? Your Honor, I think the eGuardian user agreement is key. In order for an agency to participate in the functional standard and the initiative, it must sign the eGuardian user agreement in order to- But when they do it and they don't comply, nothing happens. The agency's membership in eGuardian and its access to SARS and its ability to participate in the program can be revoked. Can be, but has anybody ever had it revoked even though they've not complied? I'm speculating. Oregon Natural Desert is on all fours with this case. That involved a final agency action. But is this a final agency action? Yes. And why? Because the functional standard has legal force, as shown through the eGuardian user agreement. Well, what's your answer to Judge Smith's question? You cited a case, but has anybody ever had their membership revoked? That is not in the record. And if I may address, Your Honor, the reason why the record is somewhat limited on final agency action issues. Plaintiffs, defendants raised final agency action and other jurisdictional issues at the motion to dismiss stage. We prevailed on the motion to dismiss. However, we repeatedly sought discovery on jurisdictional issues, including final agency action. Defendants opposed it- At the very least, then, what you're saying might happen is speculative. I do not believe it is speculative. The eGuardian user agreement makes clear that participants, agencies that sign up, want to participate in the initiative, must sign the eGuardian user agreement. They must comply with the functional standards definition. This is at FER 26, and it states that failure to comply with the agreement will result in termination of your eGuardian membership, FER 26. Let's say that happens. Scalia, go back for a minute. Does it say you must comply with the functional standards? Yes, it does. I was trying to find that language. It does. That is also at FER 26. You have been informed of and agree to and will abide by these restrictions. Incidents that do not meet the criteria of suspicious activities or with a potential nexus to terrorism and that further do not comply with the above stated rules will be immediately deleted from eGuardian. Furthermore, by clicking on the user agreement checkbox, you agree to the policies that govern the eGuardian statement. Right. See, but that's why I was asking before about the way this process works. The way I read that agreement, it says don't send us garbage. You send us garbage, you violated the agreement. Once the stuff comes to us, to the ICE Center, the analysts will then engage in this classification process that the functional standards require. That's not done by the inputting agency. It is. It is. It's done at multiple steps. No, tell me where in the eGuardian agreement they agree to do that. In the eGuardian user agreement, it says that they will only upload SARS that complies. So the vetting occurs at the fusion center stuff. It's again. Again, their liability is for uploading stuff that doesn't meet this minimum standard. Correct. It's not for uploading stuff that meets it. So it seems to me that what you're really going to be focusing on here is what happens to the information sent by the agencies once it gets in. Nobody is saying to them, if you don't send us everything that meets our standards, we'll terminate your agreement. What they're saying is if you send us stuff that doesn't meet our standards, we'll terminate your agreement. Yes, that's right. You want to save some time. Do you want to save some time? I would love to save some time. Thank you, Your Honors. Okay. Let's hear from the government. May it please the Court, Daniel Aguilar for the Department of Justice and the other federal defendants. I think it's important to understand the purpose of this program. Congress and the President acted on the recommendations of the September 11th Commission and created a nationwide system for sharing reports of suspicious activity that are potentially related to terrorism. That system allows state, local, and federal law enforcement agencies to share information so that they can identify and stop attacks before they happen. This is a preventative mission designed to allow analysts to connect disparate pieces of information so that they can connect the dots and discover the entire picture of a potential threat so that they can save lives. Plaintiffs have challenged this system by arguing that they're not doing it. But they're not challenging it because it doesn't save lives. Yeah. On both sides, both sides can delete the speeches about the great purposes or whatever. This is an APA case. So the question is really, there's only three questions in this case, and none of them have to do with grand purposes. One is, are these a final action? If they are a final action, do they comply with the APA? Nobody doubts the government's motives in doing this. Nobody doubts the motives of the other side in challenging it. Let's get to the real issues in the case. Well, the reason that I was bringing this up, Your Honor, was based on your questions on the arbitrary and capricious challenge on whether or not this has to comply with Part 23. So let's focus on that question. First of all, does an arbitrary and capricious challenge apply to an interpretive rule? I believe it can, Your Honor. Okay. I mean, that hasn't been briefed as much in this case, but that's my understanding. It hasn't been briefed. And so assuming that it can, was your explanation in 2015 sufficient to meet the arbitrary and capricious standard? It was, and I also think it's important to look throughout the administrative record here that's been compiled, and we have numerous sites to the record in the second half of our brief to explain that we have consistently, since 2007, explained why suspicious activity reports are usually not governed by Part 23, although we have also consistently explained that when they have reasonable suspicion that a particular person is engaged in a particular criminal activity, that may meet the Part 23 standard, and at that point, it should be treated as such and put into a Part 23 criminal database. Okay. So assuming that your explanation met the standard, we then get back to the separate question of whether or not this is a legislative rule, and you are required to go through the comments. And whether or not it's final agency action to begin with. Right. Okay. So if it's not final agency action, what remains to be done? If it's not final agency action, this Court does not have subject matter jurisdiction. Now, that's the consequence. I asked a different question. Sure. If it's not final agency action, what more would be done by this? It's been consummated, has it not? Yes. Bennett's Step 1 has been fulfilled. The question is whether Bennett's Step 2, whether there are legal rights or obligations that flow from this decision. Okay. So do you — and that's what I was trying to explore with your colleague. It does seem to me that this is a direction to the analysts about how to classify and circulate certain information. If an analyst refused to do that, what would happen to the analyst? If an analyst refused to circulate — Analyst said, look, I'm not circulating stuff that only has reasonable suspicion. I report to a higher standard. That higher standard is probable cause. So I'm not going to circulate this stuff. Would the analyst be fired? No. They're perfectly free to do whatever they want. Generally speaking, as the Federal Government, where we administer this program, if a State or local agency wants to meet a higher threshold, for example, reasonable suspicion, before they circulate a SAR, they're free to do so. We think that they should be disseminating information at the reasonably indicative standard, but there are no legal consequences. That's why I'm trying to figure out how this process works. They sign an agreement that says we'll send you stuff. And as your colleague said, they agree not to send you garbage. Do they agree that they have to send you everything that meets the functional standard? No. The functional standard says you should be sending this stuff, but there's no obligation for them to do that. Obviously, it's a practical benefit. It furthers the mission. Sure. But there are — Now let's get to the next step. Right. The information arrives at ICE, unfortunate acronym, because we use it elsewhere. I prefer ISE. ISE. It arrives at ISE, and it goes to an analyst. Because there are analysts there. Correct? Sure. So if I can just explain — I'm trying to figure out what happens when the information gets to ISE. You have a report of suspicious activity. The police or local authorities write up a report on that. They send it to a fusion center or the FBI. The FBI reviews that report and then decides whether or not it should be disseminated out to everyone who's participating in this program. Right. And who are the people who review that report? So at the FBI, it's federal agents. At the fusion centers, it's state or local law enforcement officers. And sometimes they're operating under — I don't believe this is in the record, but it's my understanding that sometimes they operate under a federal agreement and sometimes they're designated as federal agents. And I understood that there might be various different people. I'm that analyst, and I get that report from the local law enforcement. And I say, boy, this only arises to the level of reasonable suspicion. I don't want to send it around because I'm — I don't want to get into any of this litigation stuff. Is there any consequences to me or my agency for my action? No. There's no consequences whatsoever. There are no legal enforcement mechanisms. There are no legal sanctions. There are no enforcement proceedings that can be brought. And that's generally what this Court, the Supreme Court and other courts have looked to when you're trying to figure out whether this is something where legal rights and obligations float. To your citation of the Pincus case, I understand that cases would be setting up, essentially, parole guidelines that if particular criteria are met, you have to, or you are only permitted to grant parole on a certain number of months. And I think that's meaningfully different from this case for a particular reason. But if you have a question. What the Pincus case says, although they, these guidelines, provide no formula for the parole determination, they cannot help but focus the decision-maker's attention on the board-approved criteria. And there the Court found that was enough. And doesn't, isn't that essentially what happens here? Well, I think it's true that it's focusing your attention on particular criteria. But that was also true in Mataluna, which this Court decided, I think in 1987, I think it postdates Pincus. And there it was, whether or not you're going to grant deferred action to an alien, you have to consider certain criteria, I think it was seven criteria, on whether or not this is a deferred action candidate. And this Court said, that's not final agency action, because you're still free to consider everything. So similarly here, at first, you consider whether it fits into one of these 16 boxes of potential terrorist-related activity. The next step is, do you still think this is suspicious? Do you still want to share this? And at that point, there are no constraints on your discretion, and you're free to make that choice. But furthermore, there's no legal right or consequence that flows from that. Plaintiffs have not argued in their final agency action argument or in their legislative rule argument that they are asserting that their own rights are being legally bound or obligated. They're claiming that the State and local law enforcement agencies. Roberts. But they can do that. It can become a final action, even if your own rights are not implicated. And we're not disputing that, but we're trying to focus on, so if the claim is that the rights or obligations of State or local law enforcement are at play, what are those rights or obligations? And the only one that I think that they are attempting to hang their hat on is that the eGuardian user agreement says that you will lose access if you do not comply with the functional standard. I think that's wrong as a factual matter, and I can explain why, but even if it's not. Sotomayor, address that first. Does the eGuardian agreement say that? So it says that I don't think it should be read as a draconian order that any attempt not to comply with the functional standard mandatorily requires that the entire State agency be kicked out of the program and not have access to services? Sotomayor, is it a cap or a floor? When I read the eGuardian agreement, my first reading of it, although it's a government agreement and therefore it's not plain and unambiguous, is that what I'm telling you is don't send me stuff that doesn't arise to this level as opposed to a mandate that you must send me everything that arises to this level. Tell me what you're reading. That's also true, it's saying. But if you look at further excerpts of record 25 and 26, those are the two pages, it's also including other criteria in there as well. Please don't upload classified material. Do not put do not try to arrest somebody based on a suspicious activity report if you don't have probable cause or other constitutionally mandated standards.  or ethnicity. Well, and that's why I'm asking, it seems to say, here's you might get in trouble, maybe you're subject to your agreement being revoked, if you give us this kind of stuff that we don't want. Does it also say you can be revoked if you don't give us the stuff we want? No, it doesn't say that. And there's no obligation to share if something meets the minimum standard. As I said, if somebody chooses not to share that, there are no legal consequences. There may be practical consequences, and now other agencies are deprived of that But there's no enforcement mechanism. There's no sanction, and that's traditionally what the Court is looking for. But there may be an enforcement mechanism if you keep uploading stuff into the system that you don't want. And so that's my second point, Your Honor. Even if they were correct, even if we were kicking people out, and it's not in the record, but to my knowledge, that hasn't happened to any agency. But even if that's right, the consequence of that is that you lose access to a Federal Government database. I don't think that amounts to a legal right or consequence. Nobody has a right to access this database. You could similarly think of Well, but if you sign a contract that gives you the right to access the database, and the other party to the contract says you no longer have that right, you've lost a legal right, haven't you? I think that's important there because if it's a contract, you can have a breach of contract action. There's a legal mechanism at play. And that's what both the legislative rule analysis and the final agency analysis are focused on. What are the legal rights and consequences? So when plaintiffs are citing the Oregon Natural Desert case, that's a case about ranchers having permits from the Federal Government to graze their livestock. Those permits come with conditions, and it can potentially be revoked. That's a permit. That's a property interest. It's a legal right. And so when you place conditions and can potentially revocate that legal right, that has legal consequences. And although the cases on this point haven't clearly delineated this line, but if you look to all of the cases that find final agency action or legislative rule, what they tend to see is there is a legal vested property interest, there is a liberty interest, or there is a safe harbor from enforcement. I think that's the Chamber of Commerce case out of the D.C. Circuit. And so therefore, you're protected from enforcement mechanisms or you're able to sustain your own legal rights. Alito, and you don't have that here. That's correct. The only consequences are practical. And the — So there's no right to appeal. If your right to access the database is revoked, you can't do anything about it? Well, no. You can talk to the Federal Government, and maybe we would require your agents and analysts to have further training so that they can understand how to protect people's constitutional rights, how the functional standard works. We would work with that. And obviously, it's a preventative, cooperative mission. We want to make sure that agencies have access to this information so that they can act on it. Even if something turns out — it seems innocuous by itself, as this Court and the Supreme Court and CIA v. Sims recognize, if you have that innocent piece of information in the larger picture, it can take on greater magnitude and be the missing piece to fill in the complete puzzle so that you can identify a potential national security interest. As I look at these specific plaintiffs in this case, it seems to me that each of the complaints they have could have arisen without the existence of anything to do with this regulation, or whatever you may want to call it. Law enforcement does whatever it's going to do. Sometimes they do it right. Sometimes they do it wrong. But this seems to be an attempt to permit sharing of information without any compulsion. It's a benefit. They don't have to use it. To some degree, it's a little bit like getting access to a Google database or something like that. You can use it if you want. You don't have to use it. If you use it, we want you to do these certain kinds of things. But there are really no consequences. That's what seems to be the case here. Do you disagree with that? No, I agree with that, Your Honor. And that lack of legal consequence is precisely why, both for the final agency action inquiry and for the legislative rule inquiry, their challenge fails. And if you were to think about this. So can you have an interpretive rule without legal consequence? I think usually in those instances where I'm not sure. I mean, what happens, the cases seem to merge the legislative rule analysis and the interpretive rule analysis, which is why I asked sort of before, can you have an arbitrary and capricious interpretive rule? So it's not been briefed. I'll try to give my best understanding is usually when an agency enacts an interpretive rule, it alters the legal landscape such that it's concededly final agency action. It is a thing from which legal consequences flow, but it's not subject to the APA's further requirement of going through notice and comment. That's my understanding of the difference there. But here. But your view is that an interpretive rule still must impose legal obligations in order to be final. So under Bennett Prong II, yeah, it needs to be something from which rights and obligations are bound and legal consequences flow. I'm happy to answer any further questions the panel has. Kennedy. I think not. Thank you, counsel. Thank you. So we have some rebuttal time. Thank you. I'd like to address first Judge Hurwitz's question about the significance of the fact that agencies are not compelled to submit a SAR even if it falls within one of the 16 categories. That is not dispositive of the final agency action or legislative rule analysis because the key point for legislative rule is whether it forecloses other options. There is no other ability to submit a SAR if, unless it falls within the 16 categories. The fact that discretion remains after the application of the criteria does not preclude it from being a legislative rule. Going back to PICUS, application of the criteria produced a window, a sentencing range, and the decision makers still had to exercise discretion even after application of the criteria. But in this case, though, let's say the local agency says, you know, I don't want to submit this. Yes. I'm not going to do it. Or, alternatively, they submit it and they don't do it the way that's asked. Is there any indication in the record that if someone did that, they would suffer a legal consequence other than not getting more information? The consequence is revocation of the eGuardian membership. That's it, though, right? That is it. But, Your Honor, if Your Honors think that the analysis at all turns on a question of a history of enforcement of the eGuardian user agreement, it would be grossly unfair to rule on that issue for lack of evidence in the record, because plaintiffs specifically sought jurisdictional discovery on the final agency action issue. Defendants opposed that, and the government and the court denied it.  It's almost like Iqbal Trombley, isn't it? So, if this was going to be a dispositive issue, we should have been, it should not turn on this. The government below conceded at the motion to dismiss stage that the ability to access SARS did, was conditioned on compliance with the functional standard and the eGuardian user agreement. Let me ask my colleague, you're out of time, but let me ask any other further questions of my colleague. I do. You're both very wonderful lawyers. We could listen to you for a long time, but we're not going to. So, we thank you very much for your arguments. They've been very helpful. Thank you for the briefing on this. The case disargued is submitted, and the court stands in recess for the day.
judges: M. Smith, Hurwitz, Eaton